## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JUAN HERRERA, <br><br> on behalf of himself and all others similarly situated, <br><br>         Plaintiff, <br> vs. <br><br><br> APPLE, INC., <br><br>         Defendant. | Case No.: 1:23-cv-411 <br><br> **CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Juan Herrera ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Apple, Inc. (hereinafter "Apple" or the "Defendant"), and alleges, upon personal knowledge as to his own actions and his counsels' investigations, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its practice of harvesting data from iPhones and Apple's other consumer personal computing devices, such as iPads, Macs using apps from the Apple "App Store," etc., [hereinafter "User Information" or "UI"] which violate state consumer deceptive practice and advertising laws; federal and state trespass laws; and breaches of various equitable principles and of common law.

2.      Apple records vast amounts of User Information without the consent or even the knowledge of Plaintiff from all of his consumer computing devices that can utilize "apps" from Apple's online App Store.

3.      UI is, in fact collected, stored, and maintained by Defendant to, *inter alia*, sell

targeted advertisements to third parties that are specifically targeted at various demographics.

4.      While the details of Defendant's violations and illegal behavior are very technical and complicated, it all boils down to a very simple idea: for all of Apple's promises about how private your iPhone is, the company vacuums up a lot of data about consumers without permission.

5.      Plaintiff brings this action on behalf of all persons whose UI was harvested, acquired, and/or misappropriated because of Defendant's surreptitious and unauthorized access of such UI.

6.      Defendant's conduct amounts to breach of implied contract, violation of federal and state criminal computer trespass statutes, the Computer Fraud and Abuse Act of 1986 (CFAA), 18 USC § 1030 (a)(2)(B)],[1] of New York General Business Laws §§ 349 and 350.

7.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally and willfully accessing, recording, harvesting, and storing user actions, activities, inputs, and other metadata and for future financial gain.

## II. PARTIES

8.      Plaintiff is a resident of Nassau County and a citizen of the State of New York. Plaintiff Herrera is a current iPhone customer and has bought several successive iPhones.

9.      Plaintiff was never notified by Apple of its collection of User Information.

10.      Plaintiff bought his iPhone at a price premium to phones by other makers.

11.      Defendant Apple is a corporation organized under the laws of California, and its American headquarters and principal place of business located at One Apple Park Way, Cupertino, CA 95014.

---

[1] Any government official using an Apple device is using a "protected computer" as defined in 18 USC § 1030(e)(2), and access violates federal statutes.

12.    Defendant Apple does substantial business in New York and sells to New York consumers.

13.    The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

14.    All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents, and/or assigns.

### III. JURISDICTION AND VENUE

15.    This Court has original jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, defined below, many of which are citizens of a different state than Defendant. Defendant is a citizen of California, where it maintains its principal place of business.

16.    This Court has personal jurisdiction over Defendant because Defendant is found within this District, maintains many retail stores in this District, avails itself to the stock markets in this District, and conducts substantial consumer business in this District.

17.    Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant raises capital in the financial markets in this judicial district, and Defendant regularly transacts business in this District with consumers of New York state living in this district, and a substantial part of the events giving rise to this Complaint arose in this District.

### IV. FACTUAL ALLEGATIONS

***Background***

---

CLASS ACTION COMPLAINT                    3

18.     Apple describes itself as a company which "designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services."

19.     Apple's reported revenue for 2022 was almost $400 billion.

20.     Apple itself notes its advertising efforts in its Annual Report (hereinafter Form 10-K) "Advertising - The Company's advertising services include various third-party licensing arrangements and the Company's own advertising platforms."[2]

21.     Apple further notes that net sales of services in which Apple includes its advertising have seen profits rising steadily year over year.

22.     Apple states in its Form 10-K that ads and services are now more profitable than the sales of Macs and iPads combined.[3] It further states that for 2022 "[t]otal net sales increased 8% or $28.5 billion during 2022 compared to 2021, driven primarily by higher net sales of iPhone, Services and Mac."

### *Defendant's Privacy Policies vs. Data Collection*

23.     On its customer-facing website, Defendant has a posted Privacy Policy (the "Privacy Policy").[4]

24.     The Privacy Policy states "Privacy is a fundamental human right. It's also one of our core values."[5]

---

[2] Apple, Inc. (n.d.). *Apple, Inc. Form 10-K For the Fiscal Year Ended September 24, 2022*. Inline XBRL Viewer. Retrieved January 12, 2023, from https://www.sec.gov/ix?doc=%2FArchives%2Fedgar%2Fdata%2F320193%2F000032019322000108%2Faapl-20220924.htm.

[3] *Id.* Form 10-K p. 21 "Products and Services Performance" - Net sales of Services including ads were $78,129,000,000; net sales of iPads were $29,292,000,000; net sales of Macs were $40,177,000,000.

[4] Apple, Inc. (n.d.). *Privacy*. Apple. Retrieved January 12, 2023, from https://www.apple.com/privacy/

[5] Apple, Inc. (n.d.). *Privacy*. *Id.*

25.     Plaintiff and Class Members have been injured by the harvesting, collection, storage, and sale of their User Information.

26.     It appears that Apple, like all other web advertisers, collects demographic information to target specific advertising to consumers: ads that are specifically served to only an audience that will be most receptive to the message are the most attractive to advertisers.

27.     In effect: Apple is collecting the behavioral and demographic data from its entire base of consumer computing hardware users to allow Apple to target advertising to users with specific demographic data, inferred interests, and browsing context, bringing in more revenue.

28.     By collecting all information from all devices, through automated means, Apple can pair this data for every user transaction with unique device identifiers. and other Apple products, including iCloud and AppleCare.

29.     By combining all of Defendant's services (AppleTV and iTunes, AppleCare, ApplePay, and AppleCare) the number of individual transactions stored verges upon the unimaginable.

30.     Apple has amassed an undreamed-of amount of discrete and uniform User Information.

31.     The global big data and business analytics (BDA) market was valued at 168.8 billion U.S. dollars in 2018 and is forecast to grow to 215.7 billion U.S. dollars by 2021.[6]

32.     Chinese venture capitalist Kai-Fu Lee currently manages over $2 billion in assets as Chairman & CEO of Sinovation Ventures, a leading Chinese technology venture capital firm. The article states that the "volume of data in China's mobile payment, meal delivery and shared bike sectors is dozens of times that of the US" and with that gargantuan store of hundreds of

---

[6] Taylor, P. (2022, August 26). *Big Data and Business Analytics Revenue 2022*. Statista. Retrieved January 12, 2023, from https://www.statista.com/statistics/551501/worldwide-big-data-business-analytics-revenue/

millions of discrete transactions that are each identifiable to unique sources, any firm that can access the data with the right algorithms can not only predict consumer actions but indeed influence them. Mr. Lee famously stated, "If data were petroleum in the artificial intelligence era, then China would be Saudi Arabia."[7]

33.    Shoshana Zuboff, professor emerita at Harvard Business School, calls this trend of big data "surveillance capitalism."

34.    Professor Zuboff defines surveillance capitalism as:

> the unilateral claiming of private human experience as free raw material for translation into behavioral data. These data are then computed and packaged as prediction products and sold into behavioral futures markets — business customers with a commercial interest in knowing what we will do now, soon, and later. It was Google that first learned how to capture surplus behavioral data, more than what they needed for services, and used it to compute prediction products that they could sell to their business customers, in this case advertisers.[8]

35.    Outside the Consumer Electronics Show, Apple posted a sign that covered an entire side of the Springhill Suites Marriot hotel building, about 15 stories tall. It said, "What happens on your iPhone stays on your iPhone."[9]

---

[7] Ge, G., & Ziye, W. (2018, September 18). *China is to data what Saudi Arabia is to oil, Kaifu Lee tells Ai Forum*. 一财全球 Yicai Global. Retrieved January 12, 2023, from https://www.yicaiglobal.com/news/china-is-to-data-what-saudi-arabia-is-to-oil-kaifu-lee-tells-ai-forum.

[8] Laidler, J. (2019, March 4). *Harvard professor says surveillance capitalism is undermining democracy*. Harvard Gazette. Retrieved January 12, 2023, from https://news.harvard.edu/gazette/story/2019/03/harvard-professor-says-surveillance-capitalism-is-undermining-democracy/.

[9] https://twitter.com/chrisvelazco/status/1081330848262062080/photo/1.



36. The sign has the outline of an iPhone and the URL of the Apple privacy policy website.[10]

37. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their User Information and personal privacy, and Apple understands that value enough to advertise to consumers accordingly.

38. iPhones are advertised as "minding their own business."

---

[10] Apple, Inc. (n.d.). *Privacy. Id.*



39.     In selling its hardware and services to consumers, Apple has consistently assured consumers in its advertising that user privacy was assured.

40.     Apple describes its commitment to privacy as a "core value."

41.     The IOS software on an iPhone have screens that purport to allow the user to do what Apple claimed to be doing all along: not sharing User Information.

42.     The screens titled "Analytics and Improvements" and most tellingly, "Tracking" supposedly allow the user to turn off these intrusions.

***Apple's Harvesting of UI Data***

43.     It has come to light that while Apple touts privacy, it values profits more.

44.     The website Gizmodo broke a story that despite allowing the user to "switch on" privacy protection, that protection was illusory. "According to a new report by independent researchers, though, Apple collects extremely detailed information on you with its own apps even

when you turn off tracking, an apparent direct contradiction of Apple's own description of how the privacy protection works."[11]

45.     The article continued "The iPhone Analytics setting makes an *explicit promise*. Turn it off, and Apple says that it will 'disable the sharing of Device Analytics altogether'" (emphasis added).

46.     Researchers in the article state that in looking at data collected by a number of Apple iPhone apps—the App Store, Apple Music, Apple TV, Books, and Stocks: "They found the analytics control and other privacy settings had no obvious effect on Apple's data collection—the tracking remained the same whether iPhone Analytics was switched on or off."

47.     But how much is this really hurting consumers? A recent decision by the French data regulating agency on Apple's "illegal" data collection is telling.

48.     In an article titled "Apple Fined $8.5 Million for Illegally Collecting iPhone Owners' Data for Ads,"[12] the website Gizmodo reported "France's data protection authority, CNIL, fined Apple €8 million (about $8.5 million) Wednesday for illegally harvesting iPhone owners' data for targeted ads."

49.     The French regulator released a statement on January 4th, 2023,[13] that it was discovered that iPhones were capturing user data, even to the amount of time a user stayed on the same screen.

---

[11] Germain, T. (2022, November 8). *Apple tracks you even with its own privacy protections on, study says*. Gizmodo. Retrieved January 13, 2023, from https://gizmodo.com/apple-iphone-analytics-tracking-even-when-off-app-store-1849757558.

[12] Germain, T. (2023, January 4). *Apple fined $8.5m for illegally collecting iPhone owners' data for ADS*. Gizmodo. Retrieved January 12, 2023, from https://gizmodo.com/apple-iphone-france-ads-fine-illegal-data-1849950163.

[13] Commission Nationale de l'Informatique et des Libertés. (2023, January 4). *Identifiant Publicitaire: Sanction de 8 millions d'euros à l'encontre de Apple Distribution International*. Fil d ariane. Retrieved January 12, 2023, from https://www.cnil.fr/fr/identifiant-publicitaire-sanction-de-8-millions-deuros-lencontre-de-apple-distribution-international.

**Value of Targeted Advertising**

50.     Advertisers or Sellers pay for ads on a Social Media Platform ("SMP") like Google or Facebook per ad shown to a user (per "impression"). If that user has no interest in the wares of the Seller, then that ad impression money was wasted in the eyes of the seller.

51.     SMPs have learned that Sellers will pay more for impressions for users they have reason to believe are likely to buy. Because SMPs have vast stores of UI, SMPs could sell impressions that can be categorized by keywords of interests and demographics of users, so called "targeted" ads. SMPs use an auction like system called the "Vickrey Clarke Groves procedure." Sellers bid on the actual user "clicks" of various demographics, and SMPs sell to the higher bidder.

52.     Therefore, it is in the best interests of the bidders to bid highly for ads that are placed strategically to reach people who are likely to buy the product they sell. In other words, VCG bidding encourages targeted advertising. As Facebook collects data, it determines which ads consumers are more likely to click on, thus increasing the value of those ads for advertisers. It then sells them grouped by number of clicks.[14]

53.     A study by the Economics Department at the University of Copenhagen gave an example: "An example of a keyword is 'andelsvurderinger'[15] in the Danish market of Facebook. The average cost per click is 7,56 DKK. This can specify any add for exactly this query and advertise to potential value customers due to the interest."[16]

54.     While seemingly miniscule, the practice has netted fortunes. Facebook relies almost entirely on it: "Our advertising revenue is dependent on targeting and measurement tools that

---

[14] *Selling Keywords, Targeted Advertising, and The Social Dilemma: Networks Course blog for INFO 2040/CS 2850/Econ 2040/SOC 2090*. (2022, November 1). Retrieved January 13, 2023, from https://blogs.cornell.edu/info2040/2022/11/01/selling-keywords-targeted-advertising-and-the-social-dilemma/.

[15] Danish for "cooperative assessments."

[16] Leo-Hansen, A. (2020, June). *How is the VCG mechanism profiting Facebook?* Retrieved January 13, 2023, from University of Copenhagen, Faculty of Social Sciences, Department of Economics https://www.researchgate.net/publication/345818075_How_is_the_VCG_mechanism_profiting_Facebook.

incorporate data signals from user activity on websites and services that we do not control, and changes to the regulatory environment, third-party mobile operating systems and browsers, and our own products have impacted, and we expect will continue to impact, the availability of such signals, which will adversely affect our advertising revenue."[17]

55.    Meta, the parent company, reported advertising revenue of $69.66 billion for 2019, up 27% year-over-year.[18]

56.    As noted *supra,* Apple's ads contribute billions to profits.[19]

## V. CLASS ALLEGATIONS

57.    Plaintiff brings this Nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, and other applicable law, and a New York State Resident sub-class for the consumer claims specific to New York.

58.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All Nationwide residents whose User Information was actually or potentially accessed, collected, or acquired by Defendant as part of its software and hardware Analytics and Tracking (the "Nationwide Class").

59.    The New York State Resident Sub- Class that Plaintiff seeks to represent is defined as follows:

> All New York State residents whose User Information was actually or potentially accessed, collected, or acquired by Defendant as part of its software and hardware Analytics and Tracking (the "New York State Resident Class").

60.    Excluded from the putative Classes are the following individuals and/or entities:

Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity

---

[17] *SEC filings details*. Meta - Financials - SEC Filings Details. (n.d.). Retrieved January 13, 2023, from https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=13872030.
[18] *Id.*
[19] Apple, Inc. (n.d.). *Apple, Inc. Form 10-K For the Fiscal Year Ended September 24, 2022*.

in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff members.

61.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

62.     This action is brought and may be maintained as a class action because there is a well-defined community of interest among many persons who comprise a readily ascertainable class. A well-defined community of interest exists to warrant class wide relief because Plaintiff and Class Members were subjected to the same wrongful practices by Defendant, entitling them to the same relief.

63.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**: The Nationwide Class is so numerous that individual joinder of its members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff is informed and believes that there are at least one million Class Members. Those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

64.     **Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3)**.  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, common questions of law and fact exist as to members of the Nationwide Class and predominate over any questions which affect only individual members of the Class. These common questions include, but are not limited to:

    a.   Whether and to what extent Defendant had a duty to protect privacy of Plaintiff and Class Members;

b.  Whether Defendant had a duty not to disclose the data collected from Plaintiff and Class Members to unauthorized third parties;

c.  Whether Defendant had a duty not to use the collected User Information of Plaintiff and Class Members for its advertising purposes;

d.  Whether Defendant had a duty not to use the collected User Information of Plaintiff and Class Members for sale to third parties as part of its advertising purposes;

e.  Whether Defendant engaged in various common law violations, including trespass and breach of implied contract;

f.  Whether Defendant engaged in unfair, unlawful, or deceptive consumer practices by illegal collection of the User Information of Plaintiff and Class Members;

g.  Whether Defendant engaged in unfair, unlawful, or deceptive advertising practices by illegal collection of the User Information of Plaintiff and Class Members;

h.  Whether Plaintiff and Class Members are entitled to actual, damages, and/or statutory damages as a result of Defendant's wrongful conduct;

i.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

j.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the currently ongoing and unacknowledged harm faced as a result of Defendant's UI collection.

65.  **Typicality: Fed. R. Civ. P. 23(a)(3):** Consistent with Rule 23(a)(3), Plaintiff is a member of the Class he seeks to represent, and his claims and injuries are typical of the claims and injuries of the other Class Members. Plaintiff's UI was collected by Defendant and was in possession of Defendant at the time of this complaint. Plaintiff's damages and injuries are akin to other Class Members and Plaintiff seeks relief consistent with the relief of the Class.

66.     **Adequacy: Fed. R. Civ. P. 23(a)(4):** Consistent with Rule 23(a)(4), Plaintiff will adequately and fairly protect the interests of other Class Members.  Plaintiff has no interests adverse to the interests of absent Class Members. Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests

67.     **Predominance & Superiority: Fed. R. Civ. P. 23(b)(3):** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues.  The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

68.     **Injunctive and Declaratory Relief**.  Class certification is also appropriate under

Rule 23(b)(2) and (c). Defendant has acted or continues to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

69.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiff and Class Members to maintain user privacy;

b.   Whether Defendant made affirmative statements to Plaintiff and Class Members regarding privacy;

c.   Whether Defendant made material omissions to Plaintiff and Class Members regarding privacy;

d.   Whether Defendant made any statements to Plaintiff and Class Members regarding privacy that were material;

e.   Whether Defendant advertised its products to Plaintiff and Class Members regarding privacy;

f.   Whether Defendant used its software to harvest the UI of Plaintiff and Class Members without permission;

g.   Whether Defendant used its hardware to harvest the UI of Plaintiff and Class Members without permission; and

h.   Whether Defendant used Plaintiff's and Class Members' UI for profit.

70.     A class action is superior to other available means for fair and efficient adjudication of the claims of the Class and would be beneficial for the parties and the court. Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.  The amounts owed to the many individual Class Members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual members of the class to seek and obtain relief. A class action will serve an important public interest by permitting such individuals to effectively pursue recovery of the sums owed to them.

71.     **Risk of Prosecuting Separate Actions:** This case is appropriate for certification because class action litigation prevents the potential for inconsistent or contradictory judgments raised by individual litigation. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**<u>COUNT I</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

72.     Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 71.

73.     Defendant solicited Plaintiff and the Nationwide Class to purchase iPhones, iPads, and other consumer electronics with visual commercials and print ads.

74.     Defendant told Plaintiff and the Nationwide Class that in purchasing Apple products their privacy was assured.

75.     As stated, *supra*, one example defining invasion of data privacy Apple gave was the harvesting by others of user data.

76.    As stated, *supra*, another example defining invasion of data privacy Apple gave was user data would stay only on the device.

77.    In so doing, Plaintiff and the Nationwide Class entered into implied contracts with Apple by which Defendant Apple agreed to not to engage in invasion of user privacy, not to harvest user date, and to safeguard users from 3rd parties accessing their UI.

78.    A meeting of the minds occurred when Plaintiff and the Nationwide Class agreed to, and did, purchase Defendant's products, usually at a premium price, in exchange for, amongst other things, the protection of their UI.

79.    Plaintiff and the Nationwide Class fully performed their obligations under the implied contracts with Defendant.

80.    By its actions stated within, Defendant breached the implied contracts it made with Plaintiff and the Nationwide Class.

81.    By surreptitiously harvesting their UI and invading user privacy, Defendant diminished the value of its products to Plaintiff and the Nationwide Class, who were ultimately the users of those products.

82.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Nationwide Class have suffered (and will continue to suffer) ongoing, imminent, and impending data theft, resulting in monetary loss and economic harm; loss of the confidentiality of the harvested confidential data; and other economic and non-economic harm.

83.    As a result of Defendant's breach of implied contract, Plaintiff and the Nationwide Class are entitled to and demand actual, consequential, and nominal damages.

**COUNT II**
**Invasion of Privacy**
**(On Behalf of Plaintiff and Class Members)**

84.     Plaintiff and the Nationwide Class re-allege and incorporate by reference herein

all of the allegations contained in paragraphs 1 through 83.

85.     Plaintiff and the Nationwide Class had a legitimate expectation of privacy to their

UI and relied on and were entitled to the protection of this UI against the prying eyes of anyone.

86.     Defendant owed a duty to its customers, including Plaintiff and Class Members, to

keep integrity of its consumer devices as advertised and not gather the UI thereon, and to allow

Plaintiff and Class Members to keep such UI confidential.

87.     Defendant failed to protect device integrity, and instead it collected UI of Plaintiff

and Class Members.

88.     Defendant collected individual UI unauthorized and unknown to Plaintiff and Class

Members to access and examine the UI of Plaintiff and Class Members, for its financial gain.

89.     The unauthorized taking, custody of, and/or use Apple of the UI of Plaintiff and the

Nationwide Class (especially in the face of the absolute promises of privacy as a human right

Apple has made) is highly offensive to a reasonable person.

90.     The intrusion was into a device, place or thing, which was private, was advertised

by Apple to be private, and is entitled to be private. Plaintiff and the Nationwide Class used their

devices as part of Plaintiff's and Class Members' service relationships with Defendant, but

privately with an intention that the UI would be kept confidential and would be protected from

collection. Plaintiff and the Nationwide Class were reasonable in their belief that such information

would be kept private and would not be taken or accessed without their authorization.

91.     The actions of Defendant constitute an intentional interference with Plaintiff's and

Class Members' interest in solitude or seclusion, either as to their persons or as to their private

affairs or concerns, of a kind that would be highly offensive to a reasonable person.

92. Defendant acted with a knowing state of mind when it accessed UI, because the resulting reporting of UI that occurred could only have been an act with intent and with actual knowledge of Apple.

93. Because Defendant acted with this knowing state of mind, it knew its actions would cause injury and harm to Plaintiff and Class Members.

94. As a proximate result of the above acts and omissions of Defendant, the UI of Plaintiff and the Nationwide Class was available to Apple without authorization, causing Plaintiff and the Nationwide Class to suffer damages.

95. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Nationwide Class in that the UI maintained by Defendant can be viewed, distributed, and used by Apple for years to come. Plaintiff and the Nationwide Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

## <u>COUNT III</u>
### Breach of Confidence
### (On Behalf of Plaintiff and Class Members)

96. Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 95.

97. At all times during Plaintiff's and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' UI.

98.     As alleged herein and above, Defendant's relationship with Plaintiff and the Nationwide Class was governed by terms and expectations that Plaintiff's and Class Members' UI would be protected in confidence and would not be disclosed to any parties.

99.     Plaintiff and the Nationwide Class used Defendant's devices and Defendant's services with the explicit and implicit understandings that Defendant would protect and not permit the UI to be accessed by any party.

100.    Defendant voluntarily received in confidence the UI of Plaintiff and the Nationwide Class with the understanding UI would not be accessed or disseminated to the public or any parties.

101.    Due to Defendant's actions, the UI of Plaintiff and the Nationwide Class was taken by Apple and/or misappropriated to unauthorized third parties; beyond Plaintiff's and Class Members' confidence, and without their express permission.

102.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and the Nationwide Class have suffered damages.

103.    But for Defendant's access of Plaintiff's and Class Members' UI in violation of the parties' understanding of confidence, their UI would not have been compromised by any party, including Apple.

104.    The injury and harm Plaintiff and the Nationwide Class suffered was the reasonably foreseeable result of Defendant's unauthorized harvesting of Plaintiff's and Class Members' UI.

105.    Defendant knew or should have known its methods of securing Plaintiff's and Class Members' UI was illegal and a breach of promise and confidence.

106.    As a direct and proximate result of Defendant's breach of its confidence with Plaintiff and Class Members, Plaintiff and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences

of the breach of privacy of their Apple devices, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from user information theft and indeed the scope of that theft; (ii) costs associated with placing hardware and software with products that actually protect user privacy of UI; and (iii) the continued risk to their UI, which remain in Defendant's possession and is subject to further unauthorized use.

107.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

108.    As a result of Defendant's breaches of confidence, Plaintiff and the Nationwide Class are entitled to and demand actual, consequential, and nominal damages.

### <u>COUNT IV</u>
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §349 (a)(h)**
**(On Behalf of Plaintiff and the New York State Resident subclass)**

109.    Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 108.

110.    Plaintiff brings this claim individually and on behalf of New York State Resident class members.

111.    Plaintiff and the New York State Resident class members are individuals who reside in New York and whose User Information was illegally taken by Defendant as described, *supra*.

112.    Plaintiff and the New York State Resident class members are "persons" within the meaning of GBL §349 (h).

CLASS ACTION COMPLAINT            21

113.   GBL §349 (a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

114.   Defendant engaged in deceptive acts and practices in the form of material misrepresentations and omissions to consumers during the conduct of business with Plaintiff and the New York State Resident class members violation of GBL § 349 (a).

115.   As fully alleged within, Defendant engaged in unfair and deceptive acts and practices in violation of GBL § 349 (a); specifically, by stating that its devices would maintain user privacy, that on its computing devices you "control how your apps use your data,"[20] that on its iPhone computing device "Learn about App Tracking Transparency on iPhone. A simple new feature that puts your data back in your control."[21]

116.   Apple advertises to New York consumers on billboards, the sides of buildings, and at the point of sale on its website, as well as mass media and the internet.

117.   Apple states "Every day, people go about their lives unaware that their personal information is being harvested." Reasonable consumers would be misled by this statement to believe Apple did not harvest their personal information.

118.   Apple knowingly made such misrepresentation to mislead consumers, thereby enabling it to gather this valuable information uninterrupted.

119.   Apple covered up its willful misrepresentations with, *inter alia*, options on its iPhone to make users believe their privacy was ensured, statements on their website stating "Privacy. That's Apple," and other affirmative acts to mislead consumers.[22]

---

[20] Apple, Inc. (n.d.). *Privacy*. *Id.*
[21] Apple, Inc. (n.d.). *Privacy*. *Id.*
[22] Apple, Inc. (n.d.). *Privacy*. *Id.* Image from same, accessed January 16, 2023.



120.    Apple's knowing misrepresentations caused Plaintiff and New York State Resident class members damages as described within this Complaint.

121.    The damages described in this Count are separate and distinct from any losses as the result of Defendant's breach of implied contract or breach of warranty of merchantability and fitness of purpose.

122.    Reasonable consumers would be misled by Defendant's material misrepresentations and/or omissions concerning their privacy.

123.    Had Plaintiff and New York State Resident class members known of Defendant's intention to collect and monetize their private information, Plaintiff and New York State Resident class members would not have purchased Defendant's devices.

124.    Had Plaintiff and New York State Resident class members known of Defendant's intention to collect and monetize their private information, Plaintiff and New York State Resident

class members would not have purchased Defendant's devices at the premium price to other equivalent phones.

125.    As a direct and proximate result of Defendant's violations, Plaintiff and New York State Resident Class members suffered injury as comports with GBL § 349 (h).

126.    Plaintiff seeks restitution on behalf of New York State Resident class members for statutory damages under GBL § 349 (h).

127.    Plaintiff seeks actual damages in the amount of the disgorgement of the price premium paid to Defendant, on behalf of New York State Resident class members under GBL § 349 (h).

128.    Because Apple made knowing misrepresentations to consumers, Plaintiff seeks restitution on behalf of New York State Resident class members for statutory treble damages under GBL § 349 (h).

129.    As a direct and proximate result of Defendant's material misrepresentations and/or omissions to consumers concerning their privacy, Plaintiff New York State Resident class members continue to suffer harm.

130.    Plaintiff and the New York State Resident class members seek injunctive relief on behalf of New York Class members in the form of an order (1) compelling Defendant to cease and desist in harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of User Information have been collected, who had access to that Information, and what Defendant used it for.

131.    Plaintiff and the New York State Resident class members seek attorney's fees and any other lawful, statutory, or equitable damages to the fullest extent permitted under GBL § 349 (h).

## COUNT V

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §350**
**(On Behalf of Plaintiff and the New York State Resident subclass)**

132.    Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 131.

133.    Plaintiff brings this claim individually and on behalf of New York State Resident class members.

134.    Plaintiff and the New York State Resident class members are individuals who reside in New York and whose User Information was illegally taken by Defendant as described, *supra*.

135.    Plaintiff and the New York State Resident class members are "persons" within the meaning of GBL §349 (h).

136.    GBL §350 states: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

137.    False statements and omissions of material facts are covered under this statute.

138.    GBL §350 (a) states:

> representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

139.    Apple advertises to New York consumers on billboards, the sides of buildings, and at the point of sale on its website, as well as mass media and the internet.

140.    As stated specifically within this Complaint, Apple has billboards stating, "What happens on your iPhone stays on your iPhone."

141.    As stated above: Apple's website, the point of sale of much of its consumer products, states, "Privacy. That's Apple."

142.    Apple's CEO Tim Cook has specifically stated this on NPR radio:

> We do think that people want us to help them keep their lives private. We see that privacy is a fundamental human right that people have. We are going to do everything that we can to help maintain that trust. …
> Our view on this comes from a values point of view, not from a commercial interest point of view. Our values are that we do think that people have a right to privacy. And that our customers are not our products. We don't collect a lot of your data and understand every detail about your life. That's just not the business that we are in.

143.    This is contrary to what researchers have found to be true.[23]

144.    Apple's knowing misrepresentations caused Plaintiff and the New York State Resident class members damages as described within this Complaint.

145.    The damages described in this Count are separate and distinct from any losses as the result of Defendant's breach of implied contract or breach of warrantee of merchantability and fitness of purpose.

146.    Reasonable consumers would be misled by Defendant's material misrepresentations and/or omissions in Apple's advertising concerning their privacy.

147.    Had Plaintiff and New York State Resident class members known of Defendant's intention to collect and monetize their private information, Plaintiff and New York State Resident class members would not have purchased Defendant's devices.

148.    Had Plaintiff and New York State Resident class members known of Defendant's intention to collect and monetize their private information, Plaintiff and New York State Resident

---

[23] Germain, T. (2022, November 8). *Apple tracks you even with its own privacy protections on, study says*. Gizmodo. *Id. Supra.*

class members would not have purchased Defendant's devices at the premium price to other equivalent phones.

149.    As a direct and proximate result of Defendant's violations, Plaintiff and New York State Resident Class members suffered injury as comports with GBL § 350.

150.    Plaintiff seeks restitution on behalf of New York State Resident class members for statutory damages under GBL § 350.

151.    Plaintiff seeks actual damages in the amount of the disgorgement of the price premium paid to Defendant, on behalf of New York State Resident class members under GBL § 350.

152.    Because Apple made knowing misrepresentations to consumers, Plaintiff seeks restitution on behalf of New York State Resident class members for statutory treble damages under GBL § 350.

153.    As a direct and proximate result of Defendant's material misrepresentations and/or omissions to consumers concerning their privacy, Plaintiff New York State Resident class members continue to suffer harm.

154.    Plaintiff and the New York State Resident class members seek injunctive relief on behalf of New York Class members in the form of an order (1) compelling Defendant to cease and desist in harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of User Information have been collected, who had access to that Information, and what Defendant used it for.

155.    Plaintiff and the New York State Resident class members seek attorney's fees and any other lawful, statutory, or equitable damages to the fullest extent permitted under GBL § 350.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the New York State Class and appointing Plaintiff and their Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the collection and/or use of the UI of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to delete, destroy, and purge the UI of Plaintiff and the Class unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members; and

iii.    requiring Defendant to meaningfully educate Plaintiff and the Class about the scope of the loss of their UI, and its specific use.

D.    For an award of damages, including actual, consequential, nominal, and statutory damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: January 17, 2023

                                        **THE LAW OFFICE OF PAUL C. WHALEN, P.C.**

                                        PAUL C. WHALEN, ESQ.  [PW1300]
                                        768 Plandome Road
                                        Manhasset, NY 11030
                                        Telephone: (516) 426-6870
                                        pcwhalen@pm.me

                                        **MORGAN & MORGAN COMPLEX**
                                        **LITIGATION GROUP**
                                        JOHN A. YANCHUNIS
                                        (*Pro Hac Vice application forthcoming*)
                                        201 N. Franklin Street, 7th Floor
                                        Tampa, Florida 33602
                                        Telephone: (813) 559-4908
                                        Facsimile: (813) 222-4795
                                        jyanchunis@forthepeople.com

                                        *Attorneys for Plaintiff and the Putative Class*